UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

LAURA COMPTON            )
                         )
V.                       )            NO. 2:13-CV-254
                         )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security    )

## MEMORANDUM OPINION

This matter is before the United States Magistrate Judge, by consent of the parties under 28 U.S.C. § 636, for final resolution. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 18]. The defendant Commissioner has filed a Motion for Summary Judgment [Doc. 23]. Plaintiff's application for disability insurance benefits was denied administratively following a hearing before an Administrative Law Judge ["ALJ"].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence.

*Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff asserts that her disability onset date was December 31, 2000. Her insured status for disability insurance benefits expired on September 30, 2001. Her application for those benefits was filed over seven years later on November 13, 2008. In order to be eligible for disability insurance benefits, the plaintiff must demonstrate that she was disabled on or before September 30, 2001.

Plaintiff was 33 years of age at the time her insured status expired, a "younger" individual. She has at least a high school education. There is no dispute that she cannot return to her past relevant work as a real estate agent.

The medical record is fairly extensive, although the vast majority of the records are from the period after her insured status expired. The medical history is summarized in the defendant's brief as follows:

> The relevant medical evidence prior to Plaintiff's DLI reflects that Plaintiff had a magnetic resonance imaging (MRI) of her brain on December 30, 1999, which demonstrated multifocal bilateral cerebral white matter lesions and was suggestive of demyelinating disease (Tr. 248). An April 10, 2001 MRI also showed lesions, which was noted that, given her history, mostly likely represented demyelinating process (Tr. 246). Progress notes from the Hammond Clinic, dated February 7, 2001, indicated that Plaintiff would start Copaxone to treat her multiple sclerosis (MS), which was noted to be stable (Tr. 260). Progress notes, dated February 13, 2001, also showed that she had complaints of migraines and was started on Verapamil (Tr. 259). Notes from the Hammond Clinic dated January 2001 through April 2001 showed that Plaintiff was prescribed Prozac and Depokote (Tr. 255-58).
> On April 25, 2001, Plaintiff reported that she had fallen a week earlier and

2

reported that she had drop foot of the right leg due to MS (Tr. 255). Her right knee was swollen with pain (Tr. 255). Diagnostic impression was cellulitis (Tr. 255). On April 27, 2001, the swelling and erythema in Plaintiff's right knee were markedly reduced (Tr. 254). Her pain was reduced also, although she had some pain in her leg (Tr. 254). On May 2, 2001, it was noted the swelling and soreness were reduced (Tr. 254). On May 9, 2001, Plaintiff had tenderness in her right knee with soreness on flexion but no effusion (Tr. 253). The rest of her examination was normal (Tr. 253). Plaintiff had no right knee pain on May 23, 2001, and her knee exam was within normal limits other than localized thickening of her skin (Tr. 253).

Progress notes from her treatment on May 28, 2001, showed that Plaintiff complained of hand tremors, episodic numbness of the right leg, poor focus, increased headaches, fatigue, and falling (Tr. 252). The examination found some visual symptoms and clonus in the right lower extremity, but motor function was 5/5 in the bilateral upper extremities and 5/5 in the bilateral lower extremities (Tr. 252). Dorsal flexion was 4/5 on the right and 5/5 on the left, and plantar flexion was 5/5 on the right and 5/5 on the left (Tr. 252). The assessment was MS, fatigue, and depression (Tr. 252). Plaintiff appears to have next presented four months later on September 28, 2001, for a four-month checkup (Tr. 251). Her diagnoses of MS and depression were noted, although much of the treatment note is illegible (See Tr. 251). These were the last records from prior to Plaintiff's DLI of September 30, 2001.

Plaintiff continued to treat at the Hammond Clinic on October 31, 2001, with complaints of vertigo, light-headedness, and tingling of her left arm for two weeks (Tr. 250). Plaintiff's medications were reviewed; however, she did not see a doctor (Tr. 250). Plaintiff returned on November 6, 2011, reporting dizziness for one and a half weeks, some difficulty walking, and a tingling sensation intermittent in her left upper extremity (Tr. 250). Plaintiff had not been using Copaxone noting it was "too much hassle" (Tr. 250). Plaintiff was alert with a blunted affect, and she reported that she had contacted a new psychiatrist (Tr. 250). It was noted that Plaintiff had a recent exacerbation of her MS (Tr. 250). Plaintiff appears to have missed an appointment on February 13, 2002, and she had a prescription for Detrol refilled on February 25, 2002 (Tr. 249).

Records reflect that Plaintiff treated with Allergy, Asthma and Clinical Immunology Associates, but these cover the period of September 2002 to September 2003, after Plaintiff's DLI (See Tr. 268-95). These records reflect that Plaintiff continued to complain of frequent headaches on December 31, 2002 (Tr. 277).

Plaintiff began treatment with Mark A. Muckway, M.D., at Comprehensive Neurologic Services on July 9, 2002, about 10 months after her DLI (Tr. 320-22). Dr. Muckway recited that Plaintiff had a positive review of her neurological symptoms, noting intermittent difficulty finding words, concentration, and intermittent vertiginous difficulty with "disbalance" but she had not fallen (Tr. 320). Dr. Muckway noted that Plaintiff had been put on Copaxone, but "[d]ue to the information as well as some psychosocial issues of changing locations, occupations, and marital situations" she went off that treatment (Tr. 320). Neurologic exam showed that Plaintiff was alert and oriented times three with normal speech and with

3

intact cognition (Tr. 321). Dr. Muckway noted Plaintiff had occasional word finding difficulties "but not objectively" (Tr. 321). Plaintiff had increased tone with "several beat" clonus in the lower extremities which was not sustained (Tr. 321). Her reflexes were 2+ in her upper extremities and 3+ in the lower extremities with Babinski signs (Tr. 321). Plaintiff had a slightly spastic wide-based gait, she could not heel walk adequately, and her tandem was fair to poor (Tr. 321). Dr. Muckway noted that Plaintiff had a history of relapsing/remitting MS, and they were going to continue Plaintiff's regimen and add Provigil (Tr. 321).

On August 2, 2002, Plaintiff reported no symptoms or suggestion of MS flair (Tr. 319). On examination Plaintiff's motor examination revealed normal tone and bulk with minimal "disbalance" problems (Tr. 319). Her cranial nerves were intact, and she had slight lower extremity reflex preponderance and equivocal toe signs (Tr. 319). Plaintiff was to re-start Copaxone and was to take Neurontin for her headaches (Tr. 319). On September 5, 2002, Plaintiff had no flare or suggestion of exacerbations, motor examination revealed normal tone and bulk, and her reflexes were nonpathologic (Tr. 318). Plaintiff admitted to forgetting to take the Copaxone at times as well as her second dose of Provigil (for promotion of wakefulness) (Tr. 318). Plaintiff was to continue Copaxone for her MS and Provigil for fatigue and her Neurontin was increased for treatment of her headaches (Tr. 318).

Records from Hendricks Community Hospital contain results of diagnostic testing reflecting no active disease of her chest on December 20, 2002 (Tr. 302).

Evidence of record from after the DLI reflects that Plaintiff continued to receive treatment from 2004 to 2010 for her MS and various other conditions (Tr. 310-742). In a letter from Dr. J. Singh, Ph.D., clinical psychologist, dated April 16, 2010, Dr. Singh indicated Plaintiff received therapeutic/counseling services between December 7, 1998 and April 17, 2002, initially seeking help for depression and marital issues (Tr. 689). Dr. Singh noted that Plaintiff received individual and family counseling (Tr. 689). He stated that clinical diagnosis at that time was Major Depressive Disorder (Tr. 689). He further noted that Plaintiff had a history of mood swings and stated a diagnosis of Bipolar Disorder was being considered (Tr. 689). Dr. Singh understood that Plaintiff was also under the care of a psychiatrist and was put on medication (Depakote, Paxil, and Xanax) for mood disorder (Tr. 689). He noted that several individual and family counseling sessions were conducted with a focus on family issues (Tr. 689). He stated that her improvement in terms of her mood was variable (Tr. 689). Dr. Singh noted that at the time of her discharge, her depression related symptoms continued to persist (Tr. 689). Dr. Singh understood that such symptoms negatively interfered with Plaintiff's ability to carry out her work related responsibilities (as a Realtor), daily functioning (low energy and motivation), and family life (relationship with her then husband) (Tr. 689). Further therapeutic services, continued psychiatric care by her psychiatrist, and family therapy were recommended at the time of the termination of her services (Tr. 689).

Steven Baumrucker, M.D., saw Plaintiff for an independent medical evaluation on August 27, 2009, almost 8 years after Plaintiff's DLI (Tr. 675-76). Dr. Baumrucker's examination noted that Plaintiff walked with a markedly antalgic gait

4

favoring the right, her speech was slightly slurred and slow, and she had marked weakness in her legs bilaterally with 1+ edema in the lower extremities (Tr. 675). She had grip strength loss and extension and flexion loss in the arms bilaterally (Tr. 675). Dr. Baumrucker found that Plaintiff was "currently completely unemployable" and that her depression and bipolar disorder factored into her employability (Tr. 676). Dr. Baumrucker followed up with an addendum to the 2009 letter, presumably sometime in 2011 (almost 10 years after her DLI), and stated that after review of her medical records created prior to September 2001, Plaintiff appeared to be symptomatic even at that time (Tr. 743). Dr. Baumrucker noted that medical records at that time indicated complaints of imbalance, intermittent slurred speech, prolonged headaches, "drop foot," acute cellulitis, tremors in the hands, episodic numbness of the left leg, visual changes, falling episodes, and fatigue (Tr. 743). Dr. Baumrucker stated that it seemed "reasonable" that a patient with that constellation of symptoms would miss work frequently, probably 2 to 3 days per week or more (Tr. 743).

[Doc. 24, pgs. 2-8].

At the administrative hearing, the ALJ asked Donna Bardsley, a Vocational Expert ["VE"], to consider a person of plaintiff's age, education and work history who was restricted to light work and simple, routine job tasks. The VE identified a significant number of jobs in the regional and national economies which such a person could perform. (Tr. 37-38).

In his hearing decision, the ALJ determined that the plaintiff had severe impairments of multiple sclerosis, migraine headaches and depression as of the date she was last insured on September 30, 2001 (Tr. 11). He then found, based upon the medical records, that the plaintiff had the residual functional capacity ["RFC"] to perform simple, routine light work (Tr. 13). He found that plaintiff was not credible to the extent she described subjective complaints on and prior to September 30, 2001, which were inconsistent with his RFC finding. The ALJ found that the evidence failed to establish that the plaintiff was disabled on or before September 30, 2001, and then noted that the vast majority of the medical evidence came into being after her insured status expired. He carefully discussed the evidence from the relevant time period which showed "relapsing/remitting MS" (Tr. 15). He

concluded that "given she had relapsing/remitting MS and the lack of medical evidence around the date last insured,  *[sic]* leads to the inference that her symptoms were not so severe on or before her date last insured.  It is further noted that follow-up records from Associated Neurologists of Kingsport through February 2011 indicated that the claimant's MS, fatigue, and migraines were essentially stable on medication.  It was further noted that the claimant had only mild gate disturbance, and no new symptoms.  Nerve conduction studies in 2008 were within normal limits."  (Tr. 16).

The ALJ then discussed the plaintiff's mental state, noting that prior to her insured status expiring "the record does not include any evidence of treatment for depression beyond medication."  In spite of this, the ALJ gave plaintiff "every benefit of doubt in limiting her to simple, routine work" prior to the date her insured status expired.  (Tr. 15-16).

The ALJ gave great weight to the non-examining state agency consultants.  He gave no weight to Dr. Baumrucker's opinion due to the fact that Dr. Baumrucker did not see the plaintiff until nearly 9 years after her insured status expired.  (Tr. 16).  Based upon the testimony of the VE, the ALJ found that the plaintiff was not disabled (Tr. 16-17).

To state the obvious, the more remote in time the commencement of the Social Security evaluation process from the date the insured status expired, the more difficult it often is to determine whether a plaintiff was disabled before that status expired.  In some circumstances it would be simple.  For example, if a plaintiff became a quadriplegic while still insured, there would be no difficulty saying seven years later that he or she was disabled from the moment the condition manifested itself.  However, the effect of MS on a plaintiff, although a serious, debilitating, and progressive disease, is not so easily determined in the

remote past.  A mere diagnosis is not sufficient.  The plaintiff must have been disabled, not "on the road" to that status, on September 30, 2001.  The medical record must supply the answer, and the passage of time definitely matters in the adjudicative process.

Plaintiff generally asserts that the ALJ erred in his RFC finding, stating that it was not supported by substantial evidence.  More specifically, plaintiff first argues that the ALJ erred in his assessment of the small amount of medical evidence from the time plaintiff was still insured.  However those records, which the ALJ did in fact discuss, show fewer functional limitations than one might expect after a diagnosis of MS.  For example, the treatment note of May 28, 2001 (Tr. 252) shows the plaintiff showing symptoms of MS, but still having 5/5 motor function, 4/5 and 5/5 dorsal flexion on the right and left, and bilateral plantar flexion of 5/5.  She next returned on September 20, 2001, apparently for a four month checkup (Tr. 251).  That treatment note is not very revealing, and the time differential in the scheduling of these visits tends to negate any conclusion that those symptoms were of such severity at that time as to render her disabled.

Plaintiff argues that the ALJ erred in his credibility finding.  To be sure, hearing decisions which reach a conclusion that a claimant is not entirely credible point to activities of daily living which are at odds with subjective complaints.  However, once again, the ALJ was dealing with how limited the plaintiff was nearly a decade in the past.  His mention of the paucity of evidence concerning limitations during that time period is the primary basis of his belief that the plaintiff was not entirely credible.  Indeed, the plaintiff herself was trying to remember how she felt 10 years ago soon after finding out she had multiple sclerosis.  The records themselves do not state the existence of the limitations, and the ALJ

7

was not required to give full credence to the plaintiff's memory of that time through the hindsight of several years when her condition was undisputedly debilitating.

Plaintiff asserts that the ALJ erred in not giving any weight to Dr. Baumrucker's opinion. The ALJ explained that Dr. Baumrucker never met the plaintiff before August of 2009. Dr. Baumrucker was never a treating physician, and even if he had been, he would only have been familiar with her condition by looking at the scant record before her insured status expired and her treatment history since. Dr. Baumrucker in essence said she is certainly disabled now and, because she has MS, she *might* have been so in September of 2001. Looking across so wide a gulf of time, the ALJ was within his rights as the trier of fact to place more credence in what the medical records from then said, or did not say, than in Dr. Baumrucker's forensic evaluation.

Plaintiff then asserts that the ALJ erred by relying upon 2004 records in which Dr. Muckway described her condition as "stable at present" when he found that she was not disabled when her insured status expired. Plaintiff states "the fact is, the finding the ALJ referred to in 2004 do not relate to how she was prior to 9/31/2001." Given the lack of clear indications of disabling level severity during the time she was insured, it was certainly not erroneous for the ALJ to contrast her later records with the prior ones. Once again, he was trying to determine her work limitations in the distant past.

Plaintiff argues that the ALJ erred in his RFC finding of light, simple work, stating "neither the claimant's testimony, the opinion of Dr. Baumrucker nor the neurological records prior to 9/31/2001 indicate she was able to work at any exertional level on a full time basis." The ALJ relied upon those records, and they did not show that the plaintiff was

8

incapable of light, simple work.  Likewise, her depression was treated only with medication, and a restriction to simple, non-stressful work was not unreasonable.

This is an extremely difficult case because plaintiff filed her claim so many years after her insured status expired.  The Court believes that the ALJ genuinely did his best to fairly determine whether the plaintiff's impairments had reached disabling severity prior to September 30, 2001, and there is no basis to set aside his findings.  There is substantial evidence to support his RFC finding and his finding that the plaintiff was not disabled during the relevant time period.  Accordingly, the plaintiff's Motion for Judgment on the Pleadings [Doc. 18] is **DENIED**, and the defendant's Motion for Summary Judgment [Doc. 23] is **GRANTED**.

The clerk is directed to enter a judgment in accordance with this opinion.

SO ORDERED:


 s/ Dennis H. Inman
United States Magistrate Judge